**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LULA MARIE AUKERMAN,[1]          )   Case No. EDCV 14-1652-JPR
                                 )
                    Plaintiff,   )
                                 )   **MEMORANDUM OPINION AND ORDER**
          vs.                    )   **REVERSING COMMISSIONER**
                                 )
CAROLYN W. COLVIN, Acting        )
Commissioner of Social           )
Security,                        )
                                 )
                    Defendant.   )
_____ )

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed April 20, 2015, which the Court has taken under submission without oral argument.  For the reasons stated below, the

_____

[1] The docket lists Plaintiff's last name as "Aukeman."  The Clerk is directed to correct it to reflect her apparent true name, "Aukerman."

1

Commissioner's decision is reversed and this action is remanded for further administrative proceedings.

**II.  BACKGROUND**

Plaintiff was born in 1951. (Administrative Record ("AR") 67, 213.)  She completed high school and worked as an accountant. (AR 64, 67, 217.)

On March 29, 2011, Plaintiff submitted an application for DIB, alleging that she had been unable to work since January 21, 2010, because of a "back disc disorder," "back pain," and a "pinched nerve." (AR 193-98, 213, 216.)  After her application was denied, she requested a hearing before an Administrative Law Judge. (AR 116-17.)  It was held on September 25, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE"). (AR 37-79.)  In a written decision issued October 2, 2012, the ALJ found Plaintiff not disabled. (AR 20-30.)  On June 6, 2014, the Appeals Council denied Plaintiff's request for review. (AR 1-3.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance.

2

*Lingenfelter*, 504 F.3d at 1035 (citing *Robbins v. Soc. Sec.*
*Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  *Reddick v. Chater*, 157 F.3d 715,
720 (9th Cir. 1996).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  *Id.* at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or which has lasted, or is expected
to last, for a continuous period of at least 12 months.  42
U.S.C. § 423(d)(1)(A); *Drouin v. Sullivan*, 966 F.2d 1255, 1257
(9th Cir. 1992).

A.  <u>The Five-Step Evaluation Process</u>

An ALJ follows a five-step sequential evaluation process to
assess whether someone is disabled.  20 C.F.R. § 404.1520(a)(4);
<u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as
amended Apr. 9, 1996).  In the first step, the Commissioner must
determine whether the claimant is currently engaged in
substantial gainful activity; if so, she is not disabled and the
claim must be denied.  § 404.1520(a)(4)(i).  If she is not
engaged in such activity, the second step requires the
Commissioner to determine whether she has a "severe" impairment
or combination of impairments significantly limiting her ability

3

to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 404.1520(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether it meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. § 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 21, 2010, the alleged onset date.  (AR 22.)  At step two, he concluded that Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine, status post fusion revision," and "degenerative joint disease of the knee."   (<u>Id.</u>)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (<u>Id.</u>)  At step four, he found that Plaintiff had the RFC to perform sedentary work with additional limitations:

> [S]he is able to lift up to 10 pounds occasionally and 5
> pounds frequently; she can stand and/or walk for 6 hours
> in an 8-hour workday; she can sit for 6 hours in an 8-
> hour workday with the allowance to adjust positions and
> stand at least once an hour for a minute or two; she
> requires a sit/stand option; she cannot squat, crawl, or
> climb; she can occasionally bend; she cannot work at
> unprotected heights or around moving machinery.

(AR 23.)  Based on the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work as an accountant. (AR 37-38.)  Thus, he found Plaintiff not disabled.  (AR 38.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ erred in assessing her credibility and analyzing the opinion of treating doctor Jeffrey E. Deckey.  (J. Stip. at 3-4.)  Remand is warranted on both grounds.

1      A.    The ALJ Erred in Assessing Plaintiff's Credibility

2          Plaintiff contends that the ALJ improperly discredited her

3      subjective complaints based solely on inconsistency with the

4      objective medical evidence, erred in finding her complaints

5      inconsistent with the medical evidence, mischaracterized her

6      testimony regarding activities of daily living, and ignored her

7      "strong work history." (J. Stip. at 4-15, 22-24.) Because the

8      ALJ failed to provide a clear and convincing reason for

9      discounting Plaintiff's credibility, remand is warranted.

10          1.   Relevant background

11          In November 4, 2009, Plaintiff fell down stairs at work,

12      injuring her back, neck, left shoulder, and right hand. (AR 41-

13      42, 45, 484.) Treating neurosurgeon Israel Chambi reported that

14      even after her other injuries improved, she continued to suffer

15      back pain that radiated into her left leg. (AR 484.)

16          A January 2010 lumbar MRI showed mild disc dessication and

17      three-millimeter disc protrusions at L3-L4 and L4-L5, which

18      abutted the exiting nerve root. (AR 528.) Plaintiff complained

19      of severe back pain, which she rated an "eight" out of 10 and

20      which radiated into her left leg. (AR 524.) Upon examination,

21      Dr. Chambi noted reduced left-foot sensation, a slow gait, and

22      moderate lumbosacral muscle spasms. (AR 525.) He diagnosed

23      lumbar radiculopathy secondary to disc herniations at L3-L4 and

24      L4-L5, prescribed Vicodin and Naprosyn,[3] and advised Plaintiff to

25

26          [3] Vicodin is a narcotic pain reliever that "chang[es] the
       way the brain and nervous system respond to pain." See
27      Hydrocodone Combination Products, MedlinePlus, http://
       www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last
28      updated Oct. 15, 2014). Naprosyn is a nonsteroidal

                                    6

avoid work for three weeks.  (AR 525-26.)

Plaintiff then attempted to return to work but gave up after two months.  (AR 44-45.)  Her symptoms persisted.  (See AR 469-70, 473-74, 476-77, 481-82, 490-92, 494-95, 500-01, 505-06, 510-11, 518-20.)  Dr. Chambi reviewed her MRI and noted "definitive decompression of the descending L5 nerve root caused by disc herniation of the L4-L5."  (AR 521.)  He deemed Plaintiff temporarily totally disabled for workers'-compensation purposes.  (See AR 470, 474, 477, 482, 492, 496, 501, 506, 511, 521.)

Plaintiff began physical therapy in March 2010.  (See AR 547-49.)  A March 2010 nerve-conduction study was normal, but Dr. Chambi deemed it "incomplete" because it did not include Plaintiff's lower extremities.  (AR 511, 514-16.)  Flexion and extension views of the lumbar spine showed slight spinal-canal narrowing and minimal spurring at L3-L4 and L4-L5 and slight levoscoliosis[4] at L3 but were otherwise unremarkable.  (AR 517.)  In April 2010, Dr. Chambi prescribed Soma[5] in addition to

_____

antiinflammatory drug and "works by stopping the body's production of a substance that causes pain, fever, and inflammation."  See Naproxen, MedlinePlus, http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last updated Feb. 15, 2015).

[4] Scoliosis is a disease that causes curvature of the spine. See Scoliosis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ scoliosis.html (last updated July 28, 2014).  Levoscoliosis describes a spinal curve to the left, common in lumbar scoliosis. See Scoliosis Types, Spine-health, http://www.spine-health.com/ conditions/scoliosis/scoliosis-types (last visited July 28, 2015).

[5] Soma is a muscle relaxant.  See Carisoprodol, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html (last updated Aug. 1, 2010).

Plaintiff's pain medication and recommended that Plaintiff walk "long distances" and use her Jacuzzi daily to ease muscle spasms. (AR 506.)   In May, Dr. Chambi noted that Plaintiff experienced numbness and weakness in her left leg but that physical therapy helped her leg pain.  (AR 501.)   In July, he noted Plaintiff's pain in her left sacroiliac joint, which physical therapy might address, and stated that her prescriptions for Vicodin and Soma reduced muscle spasms and allowed her to sleep.  (AR 495.)

Plaintiff had initially improved with physical therapy, but in late August 2010, her physical therapist reported that she had plateaued without goals being met, and she was discharged from treatment.  (See AR 531-32.)   In August and September 2010, Dr. Chambi recommended epidural injections (AR 482, 492), which helped Plaintiff's pain (AR 477).   He noted a positive straight-leg test on her left leg.  (AR 482.)   By November 2010, the numbness in Plaintiff's left leg was hampering her ability to walk.  (AR 474; see also AR 469.)   Dr. Chambi noted that physical therapy had provided no lasting improvement and recommended a third epidural injection.  (AR 474.)   In December, he reported that epidurals provided only temporary relief, and physical therapy and activity increased Plaintiff's pain.  (AR 470.)

In February 2011, Plaintiff's symptoms persisted, and she also showed reduced left-side ankle-jerk reflex.  (AR 340.)   Dr. Chambi ordered an MRI and nerve-conduction studies to confirm his diagnosis of lumbar radiculopathy secondary to disc herniation. (Id.)   In late February 2011, after taking her pain medication as prescribed, Plaintiff sought emergency care for back, left-leg, and left-hip pain, with constant tingling and numbness.  (See AR

248, 251, 274.)  A February 27 x-ray showed "[m]inimal marginal spurs" "at several levels" and mild lumbar spondylosis[6] but was otherwise unremarkable.  (AR 276.)  On February 28, examination showed mild tenderness in both sacroiliac joints and a positive straight-leg test on the left side but no focal neurological deficits and no evidence of acute spinal-cord compression.  (See AR 249, 251.)  Plaintiff reported to Dr. Chambi that the emergency-room doctors had given her a local steroid shot, which helped for a couple of days, at which point she returned to the hospital with severe pain and was treated with morphine injections and Percocet.[7]  (AR 364.)

A March 2011 MRI showed mild arthropathy[8] at T12-L1 and L1-L2, mild arthropathy and nominal disc bulging at L2-L3, moderate arthropathy and "more prominent" disc bulging at L3-L4, and moderate, generalized disc bulging at L5-S1.  (AR 271-72.)

---

[6] Spondylosis is used to refer nonspecifically to degenerative conditions affecting the discs, vertebral bodies, or associated joints of the spine.  See Kimberley Middleton & David E. Fish, Lumbar Spondylosis: Clinical Presentation and Treatment Approaches, Current Review of Musculoskeletal Med. 95 (Mar. 25, 2009), available at http://www.ncbi.nlm.nih.gov/pmc/articles/ PMC2697338/pdf/12178_2009_Article_9051.pdf.

[7] Percocet, like Vicodin, is a narcotic pain reliever. See Oxycodone, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682132.html (last updated June 15, 2015).

[8] Arthropathy means joint disease, and when applied to the lumbar spine, it generally refers to degenerative disease of the joints of the spine.  See David S. Binder & Devi E. Nampiaparampil, The Provocative Lumbar Facet Joint, Current Review of Musculoskeletal Med. 16 (Mar. 31, 2009), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2684949/pdf/ 12178_2008_Article_9039.pdf.

At L4-L5, imaging showed more prominent, generalized disc bulging and considerable hypertrophy,[9] both of which caused mild narrowing of the spinal canal. (Id.)  A March 2011 nerve-conduction study confirmed "chronic and ongoing left L5 lumbar radiculopathy." (AR 259-60.)  Dr. Chambi noted that the March 2011 findings were consistent with left lumbar radiculopathy and Plaintiff's complaint that her back and leg pain increased significantly when she was seated or extended her back. (See AR 302.)  Because Plaintiff's pain had not improved with "intensive therapy," including medication, physical therapy, and two epidural injections, Dr. Chambi recommended surgery. (AR 337; see also AR 303.)

On May 2, 2011, Dr. Chambi performed left L4-L5 microdiscectomy and foraminotomy.[10]  (See AR 306-08.)  Although the surgery was successful in addressing Plaintiff's left-side pain, two weeks later she began suffering severe lumbrosacral muscle spasm and radiculopathy on her right side. (See AR 324, 331, 334.)  A June 2011 lumbar CT scan showed mild multilevel degenerative changes, a small posterior disc bulge at L4-L5, and

---

[9] Hypertrophy means overdevelopment of an organ or body part caused by neither tumor formation nor an increase in the number of cells.  See Definition of Hypertrophy, Genetics Home Reference, http://ghr.nlm.nih.gov/glossary=hypertrophy (last updated July 1, 2015).

[10] A discectomy is a surgery to remove all or part of one of the discs that cushion the vertebrae and is often performed in conjunction with a foraminotomy, which is a surgery that widens the opening where nerve roots exit the spinal canal.  See Diskectomy, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/007250.htm (last updated May 5, 2014); Foraminotomy, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/ 007390.htm (last updated Nov. 15, 2012).

a small posterior disc bulge, four-millimeter disc herniation, and mild narrowing of the spinal canal at L5-S1.  (AR 320.)  A June 2011 MRI showed a minimal disc bulge and minimal hypertrophy at L1-L2; a minimal to mild disc bulge and mild hypertrophy at L2-L3; a mild to moderate disc bulge and mild to moderate hypertrophy at L3-L4; and a mild to moderate disc bulge and moderate hypertrophy at L4-L5.  (AR 277.)  A June 2011 nerve-conduction study showed "a chronic and subacute pattern . . . consistent with . . . right L5 lumbar radiculopathy."  (AR 326.)  An injection into the lumbar muscles eased Plaintiff's pain, but an epidural injection did not help.  (AR 324, 331.)  Dr. Chambi prescribed a muscle relaxant to be taken four times daily and recommended that Plaintiff walk an hour every day and use her Jacuzzi to ease muscle spasms.  (AR 324, 331, 333-34.)

    In June 2011, Plaintiff saw pain-management specialist Dr. Roland Reinhart and was given a lumbar epidural steroid injection, which alleviated her pain by only 10 percent.  (See AR 372.)  In July 2011, Plaintiff complained that her right-side back and leg pain had been "horrible," rating it a "10" out of 10 and describing it as a constant knifelike and jabbing deep-ache pain with numbness.  (Id.)  She said pain woke her from sleep, medication helped, and walking and movement made the pain worse.  (Id.)  She had begun taking Vicodin because Percocet made her "forgetful."  (AR 375.)  Upon examination, Plaintiff had full muscle strength, decreased lumbar extension with pain, and tenderness over her right sacroiliac joint and hip bursa.  (AR 374.)  Her hips displayed normal range of motion, and she was negative for straight-leg test bilaterally but slightly positive

1  for Faber test bilaterally.[11]  (Id.)  Dr. Reinhart recommended a

2  right L5 selective nerve-block injection and that Plaintiff take

3  Norco instead of Vicodin for pain.[12]  (AR 375.)

4      On July 19, 2011, Plaintiff saw orthopedic surgeon and spine

5  specialist Dr. Deckey.  (AR 398-401; see AR 46.)  She reported

6  that her right-back and -leg pain was a "10" out of 10 and that

7  she was taking five or six Vicodin and Soma daily.  (AR 398.)

8  She reported numbness, weakness, and difficulty walking.  (AR

9  399.)  Upon examination, Dr. Deckey noted Plaintiff's distress

10  and weakness and diminished sensation in her right foot.  (Id.)

11  X-rays showed slight scoliosis and slight spondylolisthesis at

12  L4-L5.[13]  (Id.)  An MRI showed "significant" stenosis at L4-L5.[14]

13  (Id.)  Dr. Deckey diagnosed right-leg radiculopathy, spinal

14  stenosis, and degenerative spondylolisthesis.  (AR 399-400.)

15

16      [11] Whereas the straight-leg test is used to assess signs of
17  lumbar nerve-root irritation, the Faber test is used to assess
   symptoms related to the sacroiliac and hip joints.  See J.W.
18  Thomas Byrd, Evaluation of the Hip: History and Physical
   Examination, N. Amer. J. of Sports Phys. Therapy 231 (Nov. 2007),
19  available at: http://www.ncbi.nlm.nih.gov/pmc/articles/
   PMC2953301/pdf/najspt-02-231.pdf.
20

21      [12] Norco is also a narcotic pain reliever.  See Hydrocodone
   Combination Products, MedlinePlus, http://www.nlm.nih.gov/
22  medlineplus/druginfo/meds/a601006.html (last updated Oct. 15,
   2014).
23

24      [13] Spondylolisthesis is a condition in which a vertebra
   moves forward out of the proper position onto the bone below it.
25  See Spondylolisthesis, MedlinePlus, http://www.nlm.nih.gov/
   medlineplus/ency/article/001260.htm (last updated Sept. 8, 2014).

26

27      [14] Spinal stenosis is narrowing of the spinal canal and
   causes pressure on the spinal cord and nerves.  See Spinal
28  Stenosis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
   spinalstenosis.html (last updated Dec. 8, 2014).

Because more conservative treatments had failed to address her pain, Plaintiff chose the surgery recommended by Dr. Deckey. (AR 400.)

On August 8, 2011, Dr. Deckey, assisted by vascular surgeon Jeffrey Ballard, performed an L4-L5 anterior-posterior fusion with decompression and instrumentation. (AR 416-17; see AR 394.) At an August 23, 2011 follow-up visit, Plaintiff was advised to increase Norco to help with pain. (AR 394.) On August 29, 2011, Plaintiff's husband reported by phone that she still had severe pain despite taking Percocet and Norco "pretty much around the clock." (AR 393.) On September 20, 2011, Plaintiff's preoperative "severe right leg pain" persisted. (AR 440.) Dr. Deckey increased a prescription for gabapentin and continued prescriptions for Percocet and OxyContin.[15] (Id.) A CT scan showed stenosis and four- to six-millimeter disc protrusions throughout her lumbar spine. (AR 441-42.) On September 29, Plaintiff was given an epidural steroid injection with right L5 nerve-root block. (AR 561.)

On October 20, 2011, Plaintiff continued to complain of right L5 radiculopathy, which Dr. Deckey noted to be "slowly" "improving." (AR 439.) He advised that it could take up to a year for her nerve pain to subside and that she might always have some pain. (Id.) On December 6, Plaintiff complained of

---

[15] Gabapentin is used to treat neuropathy. See Gabapentin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last updated July 15, 2011). OxyContin is a narcotic pain reliever. See Oxycodone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last updated June 22, 2015).

persistent right-leg and left-foot pain, and Dr. Deckey increased
her neuropathy prescription, switched her narcotic pain reliever,
and prescribed physical therapy.  (AR 438.)  He again warned that
Plaintiff's "nerve pain may be chronic," and she should "give it
up to 1 year."  (Id.)

On March 6, 2012, Plaintiff had nearly completed physical
therapy but continued to use "a large quantity of pain medication
including Norco, Percocet, and Neurontin" and might require
long-term pain management.  (AR 436-37.)  She complained of
right-side low-back pain, bilateral foot burning, and tightness
in her left thigh.  (Id.)  She was given a trigger-point
injection in her right lower back.  (Id.)  She was noted to be
doing "relatively well given the magnitude of her surgery."
(Id.)  Dr. Deckey's physician assistant noted, however, that
"[g]iven her persistent pain, her high medication level, and her
residual symptoms, we do not feel she will be able to return to
any type of work."  (Id.)

On May 1, 2012, Plaintiff complained of "some" persistent
left low-back pain and bilateral foot pain and continued to use
"high doses of medication."  (AR 435.)  On May 31, Plaintiff saw
pain-management specialist JienSup Kim and reported that her
right-side low-back pain ranged between an "eight" and a "10" out
of 10, increased with sitting or pressure, and was accompanied by
aching right-leg pain and right-foot numbness.  (AR 552.)  She
reported that a local steroid injection had not helped her
symptoms, and she was no longer able to do physical therapy
because she had torn her meniscus.  (Id.)  Dr. Kim recommended a
lumbar facet block (AR 554), which he administered on June 18

1   (see AR 550-51).

2       At the September 25, 2012 hearing, Plaintiff testified that
3   after the second back surgery, she suffered "terrible lower back
4   pain on the right side." (AR 51.) Her back still "hurt[] all
5   the time." (AR 52.) She also had neuropathy. (AR 72.) She
6   testified that Dr. Deckey had recommended injections and
7   anticipated that Plaintiff would ultimately require another
8   spinal-fusion procedure. (Id.)

9       Plaintiff had attempted physical therapy for her back but
10  stopped because of her knee injury. (AR 54.) She testified that
11  she had been diagnosed with degenerative disease and had injured
12  the meniscus cartilage in both knees. (AR 52; see AR 557 (on May
13  31, 2012, diagnosing left-knee meniscus tear).) She said that
14  she "tr[ied] to walk a little" to help the pain in her back,
15  read, watched TV, and swam "[a] little bit" but not for "very
16  long" because she was limited by back pain. (AR 54-55, 58, 60.)
17  She tried to walk at least three or four times a week for about a
18  mile, which took about 45 minutes. (AR 59.) Walking hurt her
19  knees as well as her back. (AR 58-59, 62.) After walking and in
20  the evenings, Plaintiff spent much of her time lying down. (Id.;
21  see also AR 61.) She said she could stand or sit for about half
22  an hour at a time. (AR 60.) Sitting was more painful than
23  walking, standing, or lying down. (Id.)

24      "Once in a while," Plaintiff and her husband would host
25  their grandchildren for a visit, take them to a movie, or attend
26  their sporting events. (AR 57.) She and her husband had flown
27  to Connecticut that summer, their first trip in three years. (AR
28  55-56.) Plaintiff's doctor said that she could travel, but she

                              15

found it very painful to sit on the plane and had to get up and move around frequently.  (AR 56.)

Plaintiff testified that she did no housework other than helping her husband put away dishes.  (AR 58.)  She accompanied him to the grocery store, but he carried the groceries.  (Id.) She had hired a housekeeper because back pain prevented her from keeping house herself.  (AR 59.)  She took Soma and Percocet for pain, Ambien to help her sleep despite pain, and gabapentin for neuropathy.  (AR 71-72.)  Even when Plaintiff took her medication as prescribed, her pain was consistently an "eight" out of 10. (AR 72-74.)  The medications dulled her mental function and made her sleepy.  (AR 73.)  She did not drive and often fell asleep during the day.  (Id.)

## 2.  Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] 'could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. at 1036 (citation

16

omitted).   If such objective medical evidence exists, the ALJ may
not reject a claimant's testimony "simply because there is no
showing that the impairment can reasonably produce the <u>degree</u> of
symptom alleged."   <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir.
1996) (emphasis in original) (citation omitted).

Second, if the claimant meets the first test, the ALJ may
discredit the claimant's subjective symptom testimony only if he
makes specific findings that support the conclusion.   <u>See</u> <u>Berry</u>
<u>v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).   Absent a finding
or affirmative evidence of malingering, the ALJ must provide
"clear and convincing" reasons for rejecting the claimant's
testimony.   <u>Lester</u>, 81 F.3d at 834; <u>Ghanim v. Colvin</u>, 763 F.3d
1154, 1163 & n.9 (9th Cir. 2014).

In assessing a claimant's credibility, the ALJ may consider
(1) ordinary techniques of credibility evaluation, such as the
claimant's reputation for lying, prior inconsistent statements,
and other testimony by the claimant that appears less than
candid; (2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3) the
claimant's daily activities; (4) the claimant's work record; and
(5) testimony from physicians and third parties.   <u>Thomas v.</u>
<u>Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002); <u>Smolen</u>, 80 F.3d
at 1284.   If the ALJ's credibility finding is supported by
substantial evidence in the record, the reviewing court "may not
engage in second-guessing."   <u>Thomas</u>, 278 F.3d at 959.

### 3.   <u>Analysis</u>

The ALJ gave three reasons for discounting Plaintiff's
credibility: her pain allegations were greater than expected in

17

light of the objective medical evidence; her "somewhat limited" activities of daily living included some necessary for employment; and insufficient evidence existed that the side effects she alleged were caused by her pain medication. (AR 24.)

The objective medical evidence confirmed that Plaintiff suffered both orthopedic and neurological back issues that began with her November 2009 fall and worsened over time. Although her January 2010 MRI showed only mild disc dessication, it also showed disc L3-L4 and L4-L5 protrusions, the latter affecting Plaintiff's descending L5 nerve root. (AR 521, 528.) Plaintiff's March 2010 nerve-conduction study provided no data about her lower extremities, and contemporaneous lumbar x-rays offered no information regarding neurological impairment, so neither offered relevant data against which to compare Plaintiff's allegations.[16] (AR 511, 514-17.) A March 2011 MRI showed "more prominent" disc bulging and mild spinal-canal narrowing, and a contemporaneous nerve-conduction study confirmed "chronic and ongoing left L5 lumbar radiculopathy," results consistent with Plaintiff's complaints. (AR 259-60, 271-72, 302.) And Dr. Chambi confirmed by examination reduced sensation in Plaintiff's left foot, lumbosacral muscle spasms, positive left-leg straight-leg test, and reduced left-side ankle-jerk reflex. (See AR 340, 482, 525.)

Moreover, Plaintiff's treatment records confirm her

---

[16] X-rays generally provide limited information regarding soft tissues, such as nerves. See David L. Chandler, A leap forward in X-ray technology, MIT News (Dec. 4, 2013), available at http://newsoffice.mit.edu/2013/a-leap-forward-in-x-ray-technology-1203.

consistent severe pain and other symptoms from her back impairments – first in her left back and leg and then in her right back, leg, hip, and foot.  Although the records and Plaintiff's testimony reflect that medication helped her pain (see, e.g., AR 75, 372) and she obtained temporary relief from epidurals, trigger-point injections, and physical therapy (see, e.g., AR 364, 477, 501), she consistently complained of high levels of pain, generally rating her discomfort between an "eight" and a "10" out of 10 (see AR 72-73, 372, 398, 552).  Dr. Chambi's surgery addressed Plaintiff's left-side pain, but her back impairments began to cause right-side symptoms almost immediately, and those had not significantly improved more than a year after her second surgery.  The ALJ's conclusions that Plaintiff's surgeries had been "generally successful" and her treatment records showed "significant improvement" and no 12-month period of incapacitation were thus inaccurate.  (AR 25.)

Further, that she had undergone two back surgeries not only "suggests," as the ALJ found, "that the symptoms are genuine" (AR 25) but showed that her complaints were deemed credible by a neurosurgeon and a spine surgeon in light of the medical evidence.  As discussed below, the ALJ also erred in assessing the medical-opinion evidence, including from Plaintiff's treating back surgeons.

Even if the objective evidence did not support the severity of Plaintiff's claims, an ALJ can discount a claimant's credibility on that basis only if he also provides at least one other clear and convincing reason to do so.  (See J. Stip. at 5-6); Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991) (en

19

banc) (noting that ALJ "may not discredit a claimant's testimony
of pain and deny disability benefits solely because the degree of
pain alleged by the claimant is not supported by objective
medical evidence"); Robbins, 466 F.3d at 883 (ALJ may not
disregard subjective symptom testimony "solely because it is not
substantiated affirmatively by objective medical evidence");
accord Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).
Here, however, the ALJ's other reasons also fail.

        The ALJ erred in finding that Plaintiff's capacity for
limited walking and swimming, accompanying her husband to the
grocery store, putting away dishes, socializing with her
grandchildren, and one-time plane travel to Connecticut showed
that she could work.  (AR 24.)  "[S]omewhat limited" activities
such as these are insufficient to show that a claimant can
maintain employment.  See Vertigan v. Halter, 260 F.3d 1044, 1050
(9th Cir. 2001) (holding that assisted grocery shopping, walking
for an hour for exercise, swimming, socializing with friends,
watching television, and reading were not inconsistent with
disabling pain); Saunders v. Astrue, 433 F. App'x 531, 533 (9th
Cir. 2011) ("We have held consistently that, activities such as
light household chores, cooking meals, and grocery shopping are
activities that do not necessarily translate to the work
environment."); Colquitt v. Astrue, No. EDCV 09-2099-RC, 2010 WL
4718749, at *3 (C.D. Cal. Nov. 15, 2010) (finding that ALJ erred
in discounting credibility when claimant did limited cooking,
could but did not drive, did laundry and grocery shopping with
daughters' assistance, and sometimes walked with grandchildren to
pool); Wilson v. Colvin, No. EDCV 12-2289-OP, 2013 WL 4040122, at

*6 (C.D. Cal. Aug. 8, 2013) (finding that ALJ erred in
discounting credibility on basis of single instance of travel
when "there was no evidence . . . that Plaintiff's activities in
Kentucky were transferable to a work setting"); Gibrich v.
Astrue, No. C09-1617-MJP, 2010 WL 2747276, at *9 (W.D. Wash. June
16, 2010) ("A single trip, standing alone, is not compelling
evidence to counter a claimant's assertions as to his
limitations." (citing Tackett v. Apfel, 180 F.3d 1094, 1103 (9th
Cir. 1999) (finding that road trip to California was insufficient
to counter doctors' opinions that claimant needed to shift
positions every 30 minutes when claimant made frequent rest stops
on trip)), accepted by 2010 WL 2747262 (W.D. Wash. July 9, 2010).

Nor did the ALJ provide clear and convincing reasons to
reject Plaintiff's claims that her medication — with which, she
testified, she barely managed her pain — caused side effects that
would prevent her from working. (See AR 75.) The ALJ
acknowledged that Plaintiff was "taking a large quantity of pain
medication" – so much that her regimen not only aroused her
doctors' concern but made it difficult for the ALJ to believe
that she could still have significant pain. (AR 24, 435-37.)
Although the record contains little evidence of the effect of
Plaintiff's medications upon her functioning (see AR 375
(Percocet caused "forgetfulness")), her doctors believed that her
prescriptions reduced her functioning (see AR 274 (emergency-room
treatment notes indicating that Plaintiff should not drive while
taking prescribed medications), 433 (Dr. Deckey noting "moderate"
driving restriction), 436-37 (noting that combined effects of
Plaintiff's symptoms and medication would prevent her from

21

1  working)).   That none of them "reported her to the Department of

2  Motor Vehicles," as the ALJ noted (AR 24), is not a basis upon

3  which to question the credibility of her claims of side effects,

4  particularly when she testified that she didn't drive (AR 73).

5      Notably, Plaintiff did not have to be "incapacitated" by her

6  medications, the term the ALJ used (AR 24), for them to limit her

7  ability to work, see Vertigan, 260 F.3d at 1050.   The employment

8  at issue in this case, Plaintiff's job as a senior accountant,

9  was sedentary work requiring mental sharpness and attention to

10 detail.  (See AR 64-65 (Plaintiff testifying that she did "very

11 fast-paced senior accounting work" while seated, with only

12 occasional walking up and down stairs and no significant

13 lifting)); DOT 160.162-018 (indicating that accountant position

14 is sedentary and requires Level 5 reasoning, math, and language

15 skills; Level 2 general learning ability, verbal aptitude, and

16 numerical aptitude; and ability to direct others, attain precise

17 set limits, deal with people, and make judgments and decisions),

18 available at 1991 WL 647249.  Plaintiff testified that sitting

19 was the most uncomfortable position (AR 60) and that her

20 documented use of significant quantities of narcotic pain

21 relievers interfered with her mental functioning (AR 73).[17]

22

23      [17] Plaintiff contends that the ALJ erred in failing to
    consider that she was employed for 41 of the past 42 years,
24  including the previous 26 years.  (J. Stip. at 10; see AR 208-
    09.)  Although Plaintiff is correct that her strong work history
25  lends credence to her allegations that she was prevented from
    working by her impairments, see § 404.1529(c)(3), an ALJ is not
26  required to discuss every bit of evidence in the record, see
    Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir.
27  2003).  Because the ALJ's credibility assessment requires remand
    on other grounds, the Court need not decide whether his failure
28

Thus, even if Plaintiff's medication did not preclude all work, it is unlikely that a person using significant quantities of narcotic pain relievers and muscle relaxants could perform the precise, detailed work required of an accountant.  And the ALJ did not find that she could do any other work.  (<u>See</u> AR 29-30.) Finally, even if the ALJ did not err in assessing the evidence of side effects from Plaintiff's medication, that finding alone was not a sufficient basis upon which to discount her credibility, and as noted above, his other reasons were inadequate.

Because the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's credibility, remand is warranted.

B.   <u>The ALJ Erred in Assessing Dr. Deckey's Opinion</u>

Plaintiff contends that the ALJ failed to give specific and legitimate reasons for discounting Dr. Deckey's opinion.  (J. Stip. at 24-31, 34-35.)  Remand is warranted on this basis.

1.   <u>Relevant background</u>

On December 20, 2011, Dr. Deckey completed a Physical Capacities Evaluation form.  (AR 431-33.)  He indicated that Plaintiff could sit, stand, and walk for two hours each in an eight-hour day.  (AR 431.)  She could use her hands for simple grasping, pushing and pulling, and fine manipulation but could not use her feet for repetitive movements, such as operating foot controls.  (<u>Id.</u>)  Dr. Deckey opined that Plaintiff could lift or carry up to five pounds continuously and between five and 10

---

to consider Plaintiff's work history was error.

pounds occasionally but could never lift or carry more.[18]   (AR
432.)  She was unable to bend, squat, crawl, or climb but could
frequently reach above shoulder level.  (Id.)  Dr. Deckey opined
that Plaintiff was moderately restricted in driving and totally
restricted from working at unprotected heights and being around
moving machinery.  (AR 433.)

     In a June 15, 2012 letter, Dr. Deckey stated that
Plaintiff's medical condition rendered her "permanently
disabled."  (AR 434.)  He noted that she was "in severe pain,
under pain management and receiving epidural injections."  (Id.)

                    2.   Applicable law

     Three types of physicians may offer opinions in Social
Security cases: (1) those who directly treated the plaintiff,
(2) those who examined but did not treat the plaintiff, and (3)
those who did neither.  Lester, 81 F.3d at 830.  A treating
physician's opinion is generally entitled to more weight than
that of an examining physician, and an examining physician's
opinion is generally entitled to more weight than a nonexamining
physician's.  Id.

     This is true because treating physicians are employed to
cure and have a greater opportunity to know and observe the
claimant.  Smolen, 80 F.3d at 1285.  If a treating physician's
opinion is well supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in the record, it should be given

---

     [18] The form defined the terms "frequently" and
"occasionally" according to the Social Security regulations.
(See AR 432); SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

                              24

1   controlling weight.  § 404.1527(c)(2).  If a treating physician's

2   opinion is not given controlling weight, its weight is determined

3   by length of the treatment relationship, frequency of

4   examination, nature and extent of the treatment relationship,

5   amount of evidence supporting the opinion, consistency with the

6   record as a whole, the doctor's area of specialization, and other

7   factors.  § 404.1527(c)(2)-(6).

8        When a treating or examining physician's opinion is not

9   contradicted by other evidence in the record, it may be rejected

10  only for "clear and convincing" reasons.  <u>See</u> <u>Carmickle v.</u>

11  <u>Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008).

12  When it is contradicted, the ALJ must provide only "specific and

13  legitimate reasons" for discounting it.  <u>Id.</u>  The weight given an

14  examining physician's opinion, moreover, depends on whether it is

15  consistent with the record and accompanied by adequate

16  explanation, among other things.  § 404.1527(c)(3)-(6).  These

17  factors also determine the weight afforded the opinions of

18  nonexamining physicians.  § 404.1527(e).

19              3.  <u>Analysis</u>

20       The ALJ gave "some weight" to Dr. Deckey's statements.  (AR

21  28.)  The ALJ discounted the December 2011 opinion because it was

22  given "only four months" after surgery.  (<u>Id.</u>)  He found that the

23  limitations on lifting, carrying, postural activities, and

24  working at heights or with machinery were "reasonable given the

25  claimant's diminished strength" but other limitations weren't

26  supported by Dr. Deckey's positive findings and treatment notes.

27  (<u>Id.</u>)  The ALJ found Dr. Deckey's opinion that Plaintiff could

28  sit, stand, and walk for only two hours each to imply that "she

                              25

would have to lie down for 18 hours a day, which is inconsistent
with [her] admitted activities of daily living." (Id.) The ALJ
found that Dr. Deckey "did not document positive objective
clinical or diagnostic findings to support the [December 2011]
functional assessment." (Id.)

The ALJ discounted Dr. Deckey's June 2012 letter as
"conclusory," noting that the doctor provided "little explanation
of the evidence relied on in forming his conclusion, other than
that the claimant is in pain and receiving epidural injections,
which does not demonstrate disability." (Id.) The ALJ also
discounted Dr. Deckey's finding of permanent disability because
that determination is reserved to the Commissioner. (Id.)
Finally, the ALJ found that both of Dr. Deckey's opinions were
inconsistent with Plaintiff's "current conservative medical
treatment" and "positive response to medication" as well as the
opinions of other unspecified examining and nonexamining
physicians. (Id.)

Contrary to the ALJ's contention, Dr. Deckey's opinion was
supported by the objective medical evidence, which documented
Plaintiff's continued complaints of severe and limiting pain even
after her second spinal surgery, leading to further injections
and continued use of narcotic pain relievers. The ALJ's
characterizations of her "current" treatment as "conservative"
and her "response to medication" as "positive" were erroneous.
(See AR 72-73 (at Sept. 2012 hearing, Plaintiff rating pain
"eight" out of 10, even with medication); AR 436-38, 552 (after
second surgery, records reflecting continued severe pain despite
medication and steroid injection); AR 551 (in May 2012, pain-

management specialist noting ineffectiveness of local steroid injection and recommending lumbar-facet and sacroiliac-joint blocks); Lapierre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010) (finding treatment consisting of "copious" amounts of narcotic pain medication, occipital nerve blocks, trigger-point injections, and cervical-fusion surgery not conservative); Christie v. Astrue, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize injections, epidurals, and narcotic pain medication as "conservative"). Indeed, as the ALJ noted, Plaintiff's treating practitioners were concerned about her continued use of significant quantities of narcotic pain relievers. (AR 24; see AR 45, 435-37.)

The ALJ also erred in discounting Dr. Deckey's opinion as inconsistent with the findings of other doctors. As Plaintiff notes, the ALJ does not appear to have considered the nature and extent of Dr. Deckey's treatment relationship with her and his specialization in spinal surgery. (J. Stip. at 25, 27); see § 404.1527(c)(2)-(6). He was among her most recent practitioners and possibly the only doctor of record familiar with the entire history of her impairments. (See AR 46 (Plaintiff testifying that Dr. Deckey was critical of Dr. Chambi's treatment of her), 398-401 (Dr. Deckey noting Plaintiff's back-treatment history in treatment notes from initial consultation).) Yet the ALJ found that other medical opinions contradicted Dr. Deckey's without specifying which opinions those were or how they were contradictory. Nor can this be determined from his assessment of the medical evidence as a whole because it contains errors.

For instance, the ALJ mentioned none of Plaintiff's other

treating doctors by name in assessing their opinions, instead
discounting their opinions as a group insofar as they were made
in the context of Plaintiff's workers'-compensation claim.  Yet,
as Plaintiff notes (J. Stip. at 25, 27), treating doctors'
opinions are generally entitled to greater weight than those of
other doctors, § 404.1527(c)(2); <u>Lester</u>, 81 F.3d at 830, so the
ALJ must provide specific reasons for discounting each treating
doctor's opinion, <u>Carmickle</u>, 533 F.3d at 1164.  And discounting
medical opinions solely because they were given in the context of
a workers'-compensation claim is itself error, <u>see</u> <u>Sinohui v.</u>
<u>Astrue</u>, No. EDCV 10-908 RNB, 2011 WL 1042333, at *2 (C.D. Cal.
Mar. 18, 2011); <u>Booth v. Barnhart</u>, 181 F. Supp. 2d 1099, 1105
(C.D. Cal. 2002), and is inconsistent with the ALJ's finding that
Dr. Anthony Fenison's opinion deserved "some weight" even though
he examined Plaintiff only once, before her two spinal surgeries,
and solely in the context of her workers'-compensation claim (<u>see</u>
AR 28-29).[19]

Further, Dr. Deckey's opinion that Plaintiff could sit,
stand, and walk for only two hours each day did not, as the ALJ

---

[19] The ALJ also erred in assessing the opinions of examining
orthopedist Dr. Robert MacArthur and the state-agency physicians,
finding them to be less consistent with the record as a whole
than those of unspecified treating and examining doctors but for
reasons the ALJ did not note.  (AR 29 (giving opinions "little
weight"); <u>see</u> SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996);
§ 404.1527(e)(2)(ii) (noting that unless treating physician's
opinion is given controlling weight, ALJ must explain weight
given to state-agency physicians' opinions).  Because these
doctors found fewer limitations than were included in Plaintiff's
RFC, however, any error was not prejudicial.  <u>Stout v. Comm'r,</u>
<u>Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006) (errors
that are irrelevant to ultimate conclusion concerning disability
are harmless).

found, suggest that she had to lie down for 18 hours a day. (AR 28.) Rather, as Plaintiff notes (J. Stip. at 29-30), the assessment was explicitly keyed to an eight-hour workday, as are the assessments of the agency's own doctors (AR 431; <u>see, e.g.</u>, AR 86). Nor do Plaintiff's activities of daily living contradict that assessment. She stated that she had to change positions regularly, spent much of her time lying down, could stand for 30 minutes at a time, was able to walk for only a mile in about 45 minutes, and found sitting to be the most painful. (AR 59-61.)

And although Dr. Deckey's December 2011 opinion postdated Plaintiff's surgery by only four and a half months, it was confirmed by his June 2012 statement and Plaintiff's 2012 treatment records (<u>see</u> AR 434, 436-37) and was consistent with his expectation that, even with successful surgery, Plaintiff's pain could continue for a year (AR 438-39). Moreover, the brevity of his opinions, while not ideal, did not undermine their consistency with his relatively detailed records of Plaintiff's treatment. <u>See</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1013 (9th Cir. 2014) (ALJ erred by "fail[ing] to recognize that [treating physician's] opinions expressed in check-box form . . . were based on significant experience with [plaintiff] and supported by numerous records" and thus "entitled to weight that an otherwise unsupported and unexplained check-box form would not merit").

Finally, although the ALJ correctly noted that the determination of whether Plaintiff was disabled was reserved to the Commissioner, that does not mean that Dr. Deckey's opinion that she was disabled was without value or provide a basis to discount his medical opinion altogether, but only that the ALJ

was not bound by that finding.  (<u>See</u> AR 41); SSR 96-5p, 1996 WL 374183 at *2-3 (July 2, 1996) ("treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance," but they "must never be ignored"); <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988) (finding that ALJ erred in rejecting treating physicians' findings of disability without providing specific and legitimate bases for doing so); <u>Sharpe v. Colvin</u>, No. CV 13-01557 SS, 2013 WL 6483069, at *3 (C.D. Cal. Dec. 10, 2013) (remanding because "[a]lthough the ALJ was not bound by [doctor's] opinion that Plaintiff qualified as disabled, he failed to offer sufficient reasons for rejecting the doctor's medical conclusions").

Because the ALJ failed to provide a specific and legitimate reason for affording only "some weight" to Dr. Deckey's opinion, remand is warranted.

C.   <u>Remand for Further Proceedings Is Appropriate</u>

When, as here, an ALJ errs in denying benefits, the Court generally has discretion to remand for further proceedings.  <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended).  When no useful purpose would be served by further administrative proceedings, however, or when the record has been fully developed, it is appropriate under the "credit-as-true" rule to direct an immediate award of benefits.  <u>See</u> <u>id.</u> at 1179 (noting that "the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"); <u>Garrison</u>, 759 F.3d at 1019-20.

Under the credit-as-true framework, three circumstances must be present before the Court may remand to the ALJ with

instructions to award benefits:

> (1) the record has been fully developed and further
> administrative proceedings would serve no useful purpose;
> (2) the ALJ has failed to provide legally sufficient
> reasons for rejecting evidence, whether claimant
> testimony or medical opinion; and (3) if the improperly
> discredited evidence were credited as true, the ALJ would
> be required to find the claimant disabled on remand.

Garrison, 759 F.3d at 1020; Treichler v. Comm'r of Soc. Sec.
Admin., 775 F.3d 1090, 1100-01 (9th Cir. 2014).  When, however,
the ALJ's findings are so "insufficient" that the Court cannot
determine whether the rejected testimony should be credited as
true, the Court has "some flexibility" in applying the
credit-as-true rule.  Connett v. Barnhart, 340 F.3d 871, 876 (9th
Cir. 2003); see also Garrison, 759 F.3d at 1020 (noting that
Connett established that credit-as-true rule may not be
dispositive in all cases); Treichler, 775 F.3d at 1101 (noting
that remand for benefits is inappropriate when "there is
conflicting evidence, and not all essential factual issues have
been resolved").

Here, remand for further proceedings is appropriate.
Because the ALJ erred in assessing both Plaintiff's credibility
and Dr. Deckey's opinion, the ALJ's RFC determination and his
finding that Plaintiff could perform her past relevant work are
not supported by substantial evidence.  Moreover, the ALJ made no
finding as to whether Plaintiff could perform jobs other than her
past relevant work as an accountant.  (AR 66-70.)  On remand, the
ALJ must reassess Plaintiff's credibility, provide specific and

legitimate reasons for his treatment of the medical-opinion evidence, possibly revise Plaintiff's RFC, and elicit additional VE testimony regarding her ability to work.  Thus, remand for further proceedings is appropriate.

**VI.  CONCLUSION**

Consistent with the foregoing and pursuant to sentence four of 42 U.S.C. § 405(g),[20] IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this Memorandum Opinion.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 31, 2015

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[20]    That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."